UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------X
WILMINGTON TRUST, NATIONAL
ASSOCIATION, as Administrative Agent                    17 Civ. 6688
and Collateral Agent,

                    Plaintiff,                          OPINION

        -against-

THE ESTATE OF AUBREY K. MCCLENDON,
deceased, THOMAS J. BLALOCK, in his
capacity as Personal Representative
of the Estate of Aubrey K. McClendon,
deceased, and KATHLEN B. MCCLENDON,
in her capacity as Special Administrator
of the Estate of Aubrey K. McClendon,
deceased,

                    Defendants.
--------------------------------------------X

A P P E A R A N C E S:

            Attorneys for Plaintiff

            LATHAM & WATKINS LLP
            885 Third Avenue
            New York, NY 10022
            By:  Blair G. Connelly, Esq.
                 Arthur F. Hoge, III, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2 20 18

            Attorneys for Defendants

            PATTERSON BELKNAP WEBB & TYLER LLP
            1133 Avenue of the Americas
            New York, NY 10036
            By:  James V. Masella, III, Esq.
                 Matthew E. Funk, Esq.

CONNER & WINTERS, LLP
1700 One Leadership Square
211 N. Robinson
Oklahoma City, OK 73102
By:  Jared D. Giddens, Esq.
      Bryan J. Wells, Esq.
      J. Dillon Curran, Esq.

KAPLAN RICE LLP
142 West 57th Street, Suite 4A
New York, NY 10019
By:  Howard J. Kaplan, Esq.
      Joseph A. Matteo, Esq.

**Sweet, D.J.**

This action arises out of a personal guaranty (the "Guaranty") that was executed by the late Aubrey K. McClendon ("McClendon") to secure a $465 million loan made to certain companies McClendon controlled. The issues presented raise the always delicate and thorny issue of jurisdiction between the federal and state courts.

Thomas J. Blalock, the Personal Representative of the Estate of Aubrey K. McClendon ("Blalock" or the "Personal Representative") has moved pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss the Complaint filed by Plaintiff Wilmington Trust, National Association (the "Plaintiff" or "Wilmington"). Kathleen B. McClendon, the Special Administrator of the Estate of Aubrey K. McClendon ("Kathleen" or the "Special Administrator" and, together with the Personal Representative, the "Defendants"), has also moved to dismiss Plaintiff's Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

Based upon the conclusions set forth below, the motions are granted in part and denied in part.

**Facts**

The Complaint sets forth the following facts, which are
assumed true for the purpose of the parties' motion to dismiss.
See Koch v. Christie's Int'l PLC, 699 F.3d 141, 145 (2d Cir.
2012). As part of a motion to dismiss, a "court may consider any
written instrument attached to the complaint as an exhibit or
incorporated in the complaint by reference, as well as documents
upon which the complaint relies and which are integral to the
complaint." N.Y. Life Ins. Co. v. United States, 724 F.3d 256,
258 n.1 (2d Cir. 2013) (quoting Subaru Distribs. Corp. v. Subaru
of Am., Inc., 425 F.3d 119, 122 (2d Cir. 2005)).

The instant dispute originates from a $465 million term
loan made by Wilmington and other lenders (the "Lenders") to
American Energy Partners Holdco, LLC ("Holdco") and other
entities controlled by McClendon (together, the "Borrowers") in
November 2014 (the "Credit Agreement"). Compl. ¶¶ 1-2. Part of
the terms of the Credit Agreement included discussion of
collateral to be pledged by the Borrowers to the Lenders (the
"Equity Collateral"). See, e.g., Compl. Ex. B, § 5.2; id. Ex. C,
§ 5(b). Under the terms of the Credit Agreement, Wilmington is
the Lender's Administrative and Collateral Agent. Compl. ¶ 7.

a. The Guaranty

As an inducement to the Lenders to enter into the Credit
Agreement, McClendon executed the Guaranty to secure the loan.
Compl. ¶¶ 2, 24; id. Exs. C, D. The Guaranty contains several
clauses relevant to the current motion.

Section 3 of the Guaranty states that the Guaranty is a
"guaranty of payment and not merely of collection" and that
"Guarantor's[1] [McClendon's] obligations under this Guaranty shall
be absolutely and unconditional." Compl. Ex. C, § 3.

Section 5 of the Guaranty contains certain negative
covenants that required McClendon, as Guarantor, to refrain from
performing certain actions (the "Negative Covenants"). These
Negative Covenants included, *inter alia*, that McClendon would
"not sell, transfer, assign or otherwise dispose of, or dividend
or otherwise distribute, whether directly or indirectly, any of
the Equity Interests in an Credit Party, [or] any subsidiary . .
. ," id., § 5(g)(ii), and would "[n]ot amend or otherwise
modify, or cause any other Person to amend or otherwise modify,
any Organizational Documents of any Credit Party or any

---

[1]     Capitalized words not otherwise defined in this Opinion are
as defined in the Guaranty or the Credit Agreement.

subsidiary thereof . . . , in a manner adverse to the rights and interests of [Wilmington] or the Lenders under the Credit Documents . . . ," id., § 5(m)(i).

Section 5(l) of the Guaranty required McClendon to provide Wilmington financial information both at regular intervals and upon request (the "Financial Information Covenants"), which included: "within 75 days following the end of each calendar quarter, signed unaudited financial statements" of McClendon's; "within 15 days following the filing thereof (but not later than October 31 of the year following such tax year), copies of the most recently filed federal and state tax returns" that McClendon filed; and "promptly upon the reasonable request of [Wilmington], but in any event no later than thirty (30) days after receipt of such request, such other financial information regarding [McClendon] as so requested." Id., § 5(l).

Section 8 of the Guaranty contains an assignment clause, which provides: "The Guaranty shall be binding upon Guarantor, Guarantor's successors and assigns and Guarantor's estate and legal representatives in the event of the death or incapacity of Guarantor." Id., § 8.

Section 13 of the Guaranty contains a choice of law provision, which provides: "This Guaranty and the rights and obligations of the parties (including, without limitation, any claims sounding in contract law or tort law arising out of the subject matter hereof and any determinations with respect to post-judgment interest) shall be governed by, and shall be construed and enforced in accordance with, the laws of the state of New York." Id., § 13.

Section 14 of the Guaranty contains a mandatory forum selection clause, which provides:

> All judicial proceedings brought against any party arising out of or relating hereto or any other credit documents or any of the obligations, shall be brought in any federal court of the United States of America sitting in the borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York. By executing and delivering this Guaranty, Guarantor, for itself and in connection with its properties irrevocably (A) accepts generally and unconditionally the exclusive (subject to Clause (E) below [the Lenders' right to enforce judgments in any other jurisdiction]) jurisdiction and venue of such courts . . . .

Id., § 14 (the "Forum Selection Clause").

b. The Probate Proceeding and Wilmington Claim Appeal

McClendon died in March 2016, which resulted in a default under the terms of the Guaranty. Compl. ¶ 3; id. Ex. A, § 8.1(j). Following his death, McClendon's estate (the "Estate") entered probate, and Blalock, a former associate of McClendon, was appointed as the Estate's Personal Representative. Id. ¶¶ 41-42; In the Matter of the Estate of Aubrey K. McClendon, Deceased, Case No. PB-2016-342 (Okla. Cnty. Dist. Ct.) (the "Probate Proceeding").

In May 2016, as part of the Probate Proceeding, Wilmington presented to the Personal Representative a creditor claim against the Estate based on the Guaranty in the amount of $464,369,418.22 plus interest accrued and accruing, costs, expenses, and attorneys' fees. Compl. ¶ 43; see OKLA. STAT. tit. 58, § 331 (1988). On August 15, 2016, in the Probate Proceeding, the Personal Representative partially rejected Wilmington's creditor claim by accepting the principal amount of Wilmington's claim "less the value of certain collateral that was pledged to Wilmington in connection with the Credit Agreement and that Wilmington presently controls." Declaration of N. Martin Stringer dated October 24, 2017 ("Stringer Decl.") Ex. 1, at 1; see Compl. ¶¶ 44-45.

On September 28, 2016, Wilmington commenced an independent action against the Personal Representative for wrongful denial of its creditor claim under Oklahoma probate law in Oklahoma County District Court (the "Wilmington Claim Appeal"). Compl. ¶ 47; see Wilmington Trust, National Association v. Blalock, Case No. CJ-2016-4974 (Okla. Ctny. Dist. Ct.); OKLA. STAT. tit. 58, § 339. On September 29, Wilmington entered into a tolling agreement with the Personal Representative (the "Tolling Agreement"), under which Wilmington agreed to file the Wilmington Claim Appeal "initially only in Oklahoma on or before September 29, 2016," but reserved all rights to later file and pursue its Guaranty-related claims in New York. Compl. ¶ 49; see also Declaration of Blair Connelly dated November 14, 2017 ("Connelly Decl.") Ex. 2, at 1. Under the Tolling Agreement, the Estate agreed not to assert that Wilmington was required to file any claims in New York by September 29, 2016, or that Wilmington had waived the Guaranty's Forum Selection Clause in by not filing claims in New York by that date. See Connelly Decl. Ex. 2, at 2.

c. The SCOOP Litigation

Wilmington's dispute with the Personal Representative as to the amount of Wilmington's creditor claim under the Guaranty is not the only dispute involving the Estate before the Court. Another issue arises from the Estate's equity ownership of SCOOP Energy Company Holdings, LLC ("SCOOP Holdings") and SCOOP Energy Company, LLC ("SEC" and, together with SCOOP Holdings, the "SCOOP Res"). Compl. ¶ 96. The two issues, however, draw from the same repertory theatre of involved actors.

On November 10, 2016, Scott R. Mueller ("Mueller"), a former associate of McClendon, commenced an action in Oklahoma state court. Compl. ¶ 50; see Mueller v. SCOOP Energy Company Holdings, LLC, Case No. CJ-2016-5774 (Okla. Cnty. Dist. Ct.) (the "SCOOP Litigation"). In the SCOOP Litigation, Mueller alleges that Blalock, in his individual capacity, Ryan A. Turner, and he are entitled to certain equity interests in, amongst other businesses, SCOOP Holdings and SEC. Compl. ¶ 52; see Declaration of James V. Masella, III, dated October 24, 2017 ("Masella Decl.") Ex. 1.

As a result of Blalock's conflict of interest regarding the Estate in the context of the SCOOP Litigation, the Oklahoma

probate court appointed McClendon's widow, Kathleen, as Special Administrator of the Estate and authorized and empowered her to, *inter alia*, "[a]ppear on behalf of and represent the Estate in the SCOOP Litigation and any related appeal, mediation or arbitration." Compl. ¶ 53; see also id. ¶ 54; Masella Decl. Ex. 2, at 4.

On February 21, 2017, Wilmington's Motion to Intervene in the SCOOP Litigation was denied. Masella Decl. Ex. 3. In June and July 2017, Wilmington wrote the Special Administrator to aver that any distribution of the Estate of its equity interests in SCOOP Holdings or SEC to any plaintiff in the SCOOP Litigation would, without Wilmington's consent, violate the Guaranty's Negative Covenants. See Compl. ¶¶ 59, 97.

### d. Wilmington's Requests for Financial Information

Since May 2017, Wilmington has sent multiple letters to the Personal Representative seeking financial information from the Estate pursuant to the Financial Information Covenants. See Compl. ¶ 61. Specifically, Wilmington has requested, *inter alia*: copies of all tax returns that have been filed by or on behalf of the Estate, along with all associated schedules, forms, attachments, and other supporting documentation; information and

11

documents pertaining to life insurance policies held by McClendon or on McClendon's life; and an analysis of all liabilities of McClendon and the Estate. Compl. ¶¶ 61-62; see also Connelly Decl. Exs. 4-7. The Personal Representative objected to certain of Wilmington's requests unless Wilmington consented to particular confidentiality agreements. Compl. ¶¶ 63-68; see Connelly Decl. Exs. 8-10. Wilmington and the Personal Representative ultimately entered into an omnibus confidentiality agreement, although without conclusive resolution as to any future requests by Wilmington for financial information. See Compl. ¶ 66; Pl.'s Omnibus Opp. to Defs.' Mots. ("Pl.'s Opp.") at 13 n.9.

**Prior Proceedings**

On September 1, 2017, Plaintiff filed its Complaint, alleging causes of action for: (1) Judgment on the Guaranty (the "First Cause"); (2) Declaratory Judgment with Respect to the Negative Covenants (the "Second Cause"); (3) Declaratory Judgment with Respect to the Financial Information Covenants (the "Third Cause"); and (4) Specific Performance of the Financial Information Covenants (the "Fourth Cause"). See Compl. ¶¶ 70-114; Dkt. No. 1.

On October 24, 2017, Defendants filed their respective motions to dismiss. Dkt. Nos. 17, 20. The instant motions were heard and marked fully submitted on November 29, 2017.

**Applicable Standards**

a. Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." Makarova v. U.S., 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014). However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings." Id. "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Makarova, 201 F.3d at 113. Where a party seeks dismissal under Rule 12(b)(1) and Rule 12(b)(6), "the court must consider the Rule

12(b)(1) motion first." Stahl York Ave. Co., LLC v. City of New York, No. 14 Civ. 7665 (ER), 2015 WL 2445071, at *7 (S.D.N.Y. May 21, 2015). A motion to abstain "is considered as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)." Id., 2015 WL 2445071, at *7.

b. Rule 12(b)(6)

On a Rule 12(b)(6) motion to dismiss, all factual allegations in the complaint are accepted as true and all inferences are drawn in favor of the pleader. Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). A complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556). In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief." Twombly, 550 U.S. at 557 (internal quotation marks omitted).

While "a plaintiff may plead facts alleged upon information and belief 'where the belief is based on factual information that makes the inference of culpability plausible,' such allegations must be 'accompanied by a statement of the facts upon which the belief is founded.'" Munoz-Nagel v. Guess, Inc., No. 12 Civ. 1312 (ER), 2013 WL 1809772, at *3 (S.D.N.Y. Apr. 30, 2013) (quoting Arista Records, LLC v. Doe 3, 604 F.3d 110, 120 (2d Cir. 2010)); Prince v. Madison Square Garden, 427 F. Supp. 2d 372, 384 (S.D.N.Y. 2006); Williams v. Calderoni, 11 Civ. 3020 (CM), 2012 WL 691832, at *7 (S.D.N.Y. Mar. 1, 2012)). The pleadings, however, "must contain something more than . . . a statement of facts that merely creates a suspicion [of] a legally cognizable right of action." Twombly, 550 U.S. at 555 (citation and internal quotation omitted).

## **Defendants' Motions to Dismiss are Granted in Part and Denied in Part**

Between their respective motions to dismiss, Defendants present several different arguments for why Plaintiff's Complaint should be dismissed. Defendants invoke multiple judicial doctrines as grounds for lack of subject matter jurisdiction, including various federal abstention doctrines and

the probate exception.[2] The Special Administrator argues that
that the Court lacks personal jurisdiction over the Special
Administrator and that Plaintiff has not properly pleaded
several of its causes of action against her. The Personal
Representative argues that the Estate is not an entity that can
be sued and claims against it must be dismissed. Each argument
will be addressed in turn.

a. The Motions to Dismiss Based on Abstention is Denied

Defendants have argued that the Court should abstain from
exercising jurisdiction over Plaintiff's Complaint because of
differing, yet thematically similar lines and theories of
federal abstention doctrine: (1) Younger abstention, which
counsels federal court abstention from providing injunctive or
declaratory relief pending certain kinds of ongoing state
proceedings, see Younger v. Harris, 401 U.S. 37 (1971); Samuels
v. Mackell, 401 U.S. 66 (1971), and (2) Brillhart/Wilton
abstention, which permits courts broad discretion in determining
whether to entertain declaratory judgment actions while a
parallel state action is proceeding, see Brillhart v. Excess

---

[2]     There appears no dispute that diversity jurisdiction is
otherwise met pursuant to 28 U.S.C. § 1332 or that venue is
proper pursuant to the Guaranty's Forum Selection Clause.

Ins. Co. of Am., 316 U.S. 491 (1942); Wilton v. Seven Falls Co., 515 U.S. 277 (1995). Younger will be discussed first, then Brillhart/Wilton. As explained below, each argument for abstention is rejected.

        i. *Younger* Abstention

As the Supreme Court has explained, federal district courts should abstain from exercising jurisdiction under Younger only in three "exceptional circumstances" involving state proceedings: (1) "ongoing state criminal prosecutions," (2) "certain civil enforcement proceedings," and (3) "civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." Falco v. Justices of the Matrimonial Parts of Supreme Court of Suffolk Cnty., 805 F.3d 425, 427 (2d Cir. 2015) (quoting Sprint Commc'ns, Inc. v. Jacobs, 134 S. Ct. 584, 591 (2013)).[3] However,

---

[3]    While those three categories "define Younger's scope," Sprint, 134 S. Ct. at 591, additional, non-dispositive factors described in Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n, 457 U.S. 423 (1982), are "appropriately considered" by a district court when evaluating whether to invoke one of the three Younger categories: whether (1) "there is a pending state proceeding, (2) that implicates an important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." Falco, 805 F.3d at 427 (quoting Sprint, 134 S Ct. at 593; Spargo v. N.Y.S. Comm'n on Judicial Conduct,

17

"[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." Sprint, 134 S. Ct. at 588; see also Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976) (observing that a federal court's obligation to decide cases over which it has jurisdiction is "virtually unflagging"); Woodford v. Cmty. Action Agency of Greene Cnty., Inc., 239 F.3d 517, 522 (2d Cir. 2001) (stating that "[t]he abstention doctrine comprises a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction" and "the balance is heavily weighted in favor of the exercise of jurisdiction").

The Personal Representative contends that Younger's third category applies here because probate and probate-related proceedings ongoing in Oklahoma deal with "certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions." Sprint, 134 S. Ct. at 591. Given the similar relief sought as to the obligations owed to Wilmington under the Guaranty between this action and the Wilmington Claim Appeal, the Personal Representative avers that any order entered

---

351 F.3d 65, 75 (2d Cir. 2003)). However, the Younger categories are to be a "straightforward categorical approach" and "it remains unclear how much weight . . . [to] afford" Middlesex today. Id.

by this Court would interfere with Oklahoma's state court administrative functions.

Cases that implicate Younger's third category "generally require the state to be a party." Dudla v. P.M. Veglio LLC, No. 113 Civ. 333 (LEK) (DJS), 2016 WL 1068120, at *7 (N.D.N.Y. Mar. 15, 2016) (reviewing Supreme Court case law); see also Washington v. Cnty. of Rockland, 373 F.3d 310, 318 (2d Cir. 2004) (noting that Tranor v. Hernandez, 431 U.S. 434 (1977) extended "Younger abstention to state civil proceedings where the state government is a party"); Marshall v. N.Y.S. Pub. High Sch. Athletic Ass'n, Inc., No. 17 Civ. 6310 (EAW), 2017 WL 6003228, at *4 (W.D.N.Y. Dec. 4, 2017) ("Lastly, the state courts are not involved in this action, rendering the third narrow circumstance in which this Court may invoke Younger abstention inapplicable.") While not expressly stated, this general application hues Younger's third abstention category to its broader purpose: to be invoked by federal courts when litigants seek federal courts to enjoin or otherwise compel state court action while an underlying state court proceeding remains ongoing. See, e.g., Holland v. Bouchard, No. 16 Civ. 5936 (VSB), 2017 WL 4180019, at *3 (S.D.N.Y. Sept. 19, 2017) (dismissing plaintiff's civil rights complaint and finding that "[Younger] [a]bstention is appropriate . . . because the

Delaware Court of Chancery has a strong interest in enforcing its orders relating to the governance and management of Delaware corporations"); Eveland v. Maryland, No. 16 Civ. 762 (CCB), 2016 WL 6780207, at *1-*2 (D. Md. Nov. 16, 2016) (dismissing under Younger a plaintiff's complaint seeking injunctive relief to prevent liquidation of estate currently contested in state court), aff'd sub nom. Eveland v. Maryland Through Frosh, 691 F. App'x 111 (4th Cir. 2017); Glatzer v. Barone, 614 F. Supp. 2d 450, 451, 459 (S.D.N.Y. 2009) (denying plaintiff's request for injunctive relief to compel state court to hear dismissed cases and enjoin state appellate court), aff'd, 394 F. App'x 763 (2d Cir. 2010); cf. Pennzoil Co. v. Texaco, Inc., 481 U.S. 1, 14 & n.12 (1987) (vacating injunction that prohibited enforcement of state court judgment issued by a federal court because of alleged constitutional violations, holding that "[n]ot only would federal injunctions in such cases interfere with the execution of state judgments, but they would do so on grounds that challenge the very process by which those judgments were obtained" but expressly stating that the "opinion does not hold that Younger abstention is always appropriate whenever a civil proceeding is pending in a state court").

Nothing Plaintiff seeks in the instant action would "bar a state from carrying out the proper administration of its justice

system," Glatzer, 614 F. Supp. 2d at 460; were Plaintiff to succeed on the merits, it would not result in "enjoin[ing] state proceedings or invalidat[ing] a state court order," Lamont v. Farucci, No. 16 Civ. 7746 (KMK), 2017 WL 6502239, at *8 (S.D.N.Y. Dec. 18, 2017) (collecting cases). Rather, Plaintiff asks that this Court interpret the Guaranty and adjudicate rights under it; in doing so, this Court will neither instruct the Oklahoma probate court in the Probate Proceeding how to distribute the Estate nor the Oklahoma state court in the Wilmington Claim Appeal how it should apply any judgment rendered here when it resolves Plaintiff's appeal. Admittedly, should Plaintiff prevail in either this action or the Wilmington Claim Appeal, the end result may be the same. However, "Younger abstention is not appropriate even when there is a risk of litigating the same dispute in parallel and redundant state and federal proceedings." Mulholland v. Marion Cnty. Election Bd., 746 F.3d 811, 816 (7th Cir. 2014).[4]

The authorities cited by the Personal Representative each demonstrate that Younger abstention is warranted when state courts and their orders are directly challenged, a circumstance

---

[4]     As the situation here does not implicate any of the three "exceptional circumstances" that define Younger's scope, there is no need to consider any of the Middlesex conditions. See Sprint, 134 S. Ct. at 593-94.

inapposite to the present matter. In Grant v. Bostwick, the court abstained, in part, under Younger because the relief sought would have required ordering the presiding probate court judge to take certain actions. No. 15 Civ. 874 (WQH) (BLM), 2016 WL 3983075, at *3, *5 (S.D. Cal. July 21, 2016). In Freeman v. Texas, the court abstained under Younger when the plaintiff sought injunctive relief prohibiting a probate court from handling guardianship of a relative's property and declaratory relief that the state probate court's order was "null and void." No. Civ.A. H-08-2050, 2008 WL 4155346, at *1, *4 (S.D. Tex. Sept. 2, 2008). In Goldman v. Estate of Goldman, the court invoked several abstention doctrines, including Younger, when refraining from interfering with state courts "enforcing its orders and judgments, specifically 'in forcing persons to transfer property in response to a court's judgment.'" 97 F. Supp. 2d 370, 377 (S.D.N.Y. 2000). In Raney v. Dist. Court of Trego Cnty., the court abstained, in part under Younger, from hearing a complaint that sought to "open an investigation into probate proceedings" and "annul [plaintiff's] mother's will." No. 16 Civ. 4108 (DDC) (KGS), 2016 WL 6277703, at *5 (D. Kan. Oct. 27, 2016). These cases animate why Younger abstention is inappropriate here: here, no state court order is being challenged and no order to compel action is sought.

ii. *Brillhart/Wilton* Abstention

As an alternative, Defendants contend that the Court should abstain from Plaintiff's Second and Third Causes, requests for declaratory judgment, under the discretionary standards laid out in Brillhart and Wilton. Abstention is proper, Defendants contend, because there is no actual controversy present here and, even if so, there is parallelism between the relief sought in this action and in the SCOOP Litigation, rendering Plaintiff's claims in this action unnecessary because they can be adequately resolved in Oklahoma court.[5]

Under the Declaratory Judgment Act ("DJA"), federal courts are permitted, "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The Supreme Court has explained that, when there are pendant parallel state court proceedings, "district courts possess

---

[5]     Plaintiff dedicates part of its opposition briefing to argue against abstention under Colorado River Water Conservation Dist. v. United States, 424 U.S. 800 (1976), a different abstention doctrine promulgated by the courts. However, as neither Defendant argues for Colorado River abstention, it need not be addressed. See Special Administrator's Reply in Supp. ("Special Adm'r's Reply") 7 n.6; Pl.'s Opp. 29 n.26.

discretion in determining whether and when to entertain an
action under the [DJA], even when the suit otherwise satisfies
subject matter jurisdictional prerequisites" because "where
another suit involving the same parties and presenting
opportunity for ventilation of the same state law issues is
pending in state court, a district court might be indulging in
'[g]ratuitous interference,' if it permitted the federal
declaratory action to proceed." Wilton, 515 U.S. at 282-83
(internal citations omitted) (alternation in original) (quoting
Brillhart, 316 U.S. at 495); see also MedImmune, Inc. v.
Genentech, Inc., 549 U.S. 118, 136 (2007) (quoting Wilton, 515
U.S. at 286) (noting that the DJA "has long been understood 'to
confer on federal courts unique and substantial discretion in
deciding whether to declare the rights of litigants'").

As a threshold matter, the Special Administrator contends
that Plaintiff's Second Cause, which requests declaratory relief
regarding the Negative Covenants needs to be dismissed because
there is no actual controversy present. According to the Special
Administrator, the outcome of the SCOOP Litigation, and
ultimately whether the Special Administrator will be instructed
by that court to transfer equity in the SCOOP Res, is too
speculative and hypothetical to support a declaratory judgment.

As the Supreme Court has held, a dispute meriting declaratory relief must be "definite and concrete, touching the legal relations of the parties having adverse legal interests; and that it be real and substantial and admit of specific relief through a decree of a conclusive character as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." MedImmune, 549 U.S. at 127. However, "[t]he difference between definite, concrete and substantial controversies which are justiciable, and hypothetical, abstract, or academic ones which are not justiciable, is one of degree, to be determined on a case by case basis." Muller v. Olin Mathieson Chem. Corp., 404 F.2d 501, 504 (2d Cir. 1968). As such, "a touchstone to guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability has already accrued or the threatened risk occurred, or rather whether the feared legal consequence remains a mere possibility, or even probability of some contingency that may or may not come to pass." Dow Jones & Co. v. Harrods, Ltd., 237 F. Supp. 2d 394, 406-07 (S.D.N.Y. 2002) (citing Thomas v. Union Carbide Agric. Prod. Co., 473 U.S. 568, 580-81 (1985)), aff'd, 346 F.3d 357 (2d Cir. 2003). Moreover, that "liability may be contingent does not necessarily defeat jurisdiction of a declaratory judgment action." Associated Indem. Corp. v. Fairchild Indus., Inc., 961 F.2d 32,

35 (2d Cir. 1992). Where liability is contingent, a court should focus on "the practical likelihood that the contingencies will occur." Id. "[U]nder the 'practical likelihood' test . . . , a court must assess as a matter of fact how likely it is that the contingent event upon which the controversy rests will occur." U.S. Dep't of Treasury v. Official Comm. of Unsecured Creditors of Motors Liquidation Co., 475 B.R. 347, 363 (S.D.N.Y. 2012) (quoting Associated Indem. Corp., 961 F.2d at 35).

Here, an "alleged liability" or "threatened risk" has already accrued: a contract was signed between McClendon and others agreeing to transfer interest in the SCOOP Res. As the situation stands now, there is an unanswered question as to whether such an action breaches the Guaranty and what obligations are owed to Wilmington pursuant to the Negative Covenants. While Oklahoma state court may ultimately determine that the disputed contract is unenforceable for any number of reasons—an admitted contingency—it is a practical likelihood that the alleged accrued liability will remain and result in subsequent litigation by Wilmington against the Estate. See Nike, Inc. v. Already, LLC, 663 F.3d 89, 96 (2d Cir. 2011) ("[T]he threat of future litigation remains relevant in determining whether an actual controversy exists."), aff'd, 568 U.S. 85 (2013). Moreover, the Special Administrator has stated

that, should the SCOOP Litigation render a judgment requiring

transfer of the SCOOP Res, it would understandably comply, which

makes the parties of any future litigation for possible breach

and damages clear. Westcode, Inc. v. Mitsubishi Elec. Corp., 171

F. Supp. 3d 43, 49 (N.D.N.Y. 2016) (finding plaintiff's

declaratory relief claim ripe for adjudication because, in part,

"the court can be certain of the exact parties and claims that

would arise in any potential future litigation"). Westcode, Inc.

v. Mitsubishi Elec. Corp., 171 F. Supp. 3d 43, 49 (N.D.N.Y.

2016). As such, there are sufficient facts presented to remove

this claim from the realm of the impermissibly hypothetical into

the realm of the justiciable.


The situation here is distinguishable from authorities

cited by the Special Authority both in her briefing and oral

argument. For example, in Harbor Distrib. Corp. v. GTE

Operations Support Inc., that court declined jurisdiction when a

plaintiff lease sought declaratory relief against a defendant

leaser to prevent a breach of lease that had not occurred yet.

See 176 F. Supp. 3d 204, 212 (E.D.N.Y. 2016). Similarly, in Obal

v. Deutsche Bank Nat. Tr. Co., this Court declined jurisdiction

over a declaratory judgment claim because there was no "real and

immediate legal controversy" over the validity of an assignment

of property, when the harm was based solely on the plaintiff's

allegation. See No. 14 Civ. 2463 (RWS), 2015 WL 631404, at *5 (S.D.N.Y. Feb. 13, 2015), aff'd sub nom. Obal v. Deutsche Bank Nat'l Tr. Co., 670 F. App'x 10 (2d Cir. 2016). Unlike both these cases, where no harm could be even plausibly pointed to, here the alleged harm, the contract authorizing the transfer of SCOOP equity, is already existent.[6]

The question of actual controversy resolved, it is also necessary to consider whether the Court should exercise its discretion in declining jurisdiction. To determine whether to exercise its discretion to consider a declaratory judgment claim, the Second Circuit in Dow Jones instructed a district court to consider five prudential factors:

> (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; . . . (2) whether a judgment would finalize the controversy and offer relief from uncertainty[;] . . . (3) whether the proposed remedy is being used merely for procedural fencing or a race to res judicata; (4) whether the use of a declaratory judgment would increase friction between sovereign legal systems or

---

[6]    Torchlight Loan Servs., LLC v. Column Fin., Inc., No. 11 Civ. 7426 (RWS), 2012 WL 3065929 (S.D.N.Y. July 25, 2012), is also inapposite, albeit on different grounds. There, this Court declined to hear a declaratory judgment claim because it was "identical" to relief being sought by the plaintiff in an "already-existing breach of contract claim." Id., 2012 WL 3065929, at *13. Here, there is no parallel breach of contract claim, and as Wilmington was denied the ability to intervene in the SCOOP Litigation, it is therefore is not a party in any related parallel litigation.

28

> improperly encroach on the domain of a state or
> foreign court; and (5) whether there is a better or
> more effective remedy.

New York v. Solvent Chem. Co., Inc., 664 F.3d 22, 26 (2d Cir.

2011) (quoting Dow Jones & Co., Inc., 346 F.3d at 359-60

(alterations in original); see also McCullough v. World

Wrestling Entm't, Inc., No. 15 Civ. 1074 (VLB), 2016 WL 3962779,

at *16 (D. Conn. July 21, 2016) (citing Solvent Chem. Co., 664

F.3d at 26) ("Thus, the law is clear that not only should the

Court consider all five factors from Dow Jones, the Court is

indeed required to do so."). "If a court finds that either of

the first two factors are satisfied, it must hear the

declaratory judgment action." Windstream Servs., LLC v. BMG

Rights Mgmt. (US) LLC, No. 16 Civ. 5015 (KMW) (RLE), 2017 WL

1386357, at *5 (S.D.N.Y. Apr. 17, 2017) (collecting cases).[7]

---

[7]    Plaintiff notes that the Second Circuit has stated that
Wilton abstention does not apply to actions where a plaintiff
seeks more than purely declaratory relief, and that because
Plaintiff here seeks specific performance injunctive relief
under the Financial Information Covenants and costs, expenses,
and attorneys' fees, application of the doctrine is
inappropriate. See Niagara Mohawk Power Corp. v. Hudson River-
Black River Regulating Dist., 673 F.3d 84, 106 & n.7 (2d Cir.
2012); Compl. 25-27. That is correct for the majority of
Plaintiff's claims as against the Personal Representative; as to
the remaining claim against the Special Administrator is for
purely declaratory relief, see infra at 45-48, Wilton analysis
as to the Second Cause is warranted.

Turning to the first two factors, whether the judgment will serve a useful purpose in clarifying or settling legal issues involved and offer relief from uncertainty, weigh in favor of exercising jurisdiction. As of right now, in the unstated background of the SCOOP Litigation is the determination of what rights and relief Wilmington has and can seek based on the outcome of that case. See Masella Decl. Ex. 1 at 15. However, Wilmington has not been permitted to participate in that proceeding and, as such, has been denied an "opportunity for ventilation" of its rights as bargained-for in the Guaranty. Brillhart, 316 U.S. at 495; see Masella Decl. Ex. 3. A decision of this Court would provide Wilmington "relief from uncertainty" as to future claims of right, which is all that these Dow Jones factors demand. See Allstate Ins. Co. v. Essiam, No. 15 Civ. 180 (JCH), 2015 WL 3796243, at *2 (D. Conn. June 17, 2015) (emphasis added) ("The first two Dow Jones factors ask whether a declaratory judgment would provide clarity and finality with regard to the issues before the federal court, not the issues before the state court.").

Under Second Circuit authority, satisfaction of the first two factors is sufficient to warrant maintaining jurisdiction of a matter. See Windstream Servs., 2017 WL 1386357, at *5. However, the remaining three factors likewise countenance

30

continuing to hear Wilmington's claims. See Dow Jones, 346 F.3d at 359-60.

Under the third factor, Plaintiff's selection of this Court to adjudicate this claim does not militate towards abstention because it has not been established that Plaintiff's action is for some improper purpose. Rather, that there is a bargained-for Forum Selection Clause provides strong support to the contrary. See Allstate Ins. Co., 2015 WL 3796243, at *3 (internal quotation marks and citation omitted) (rejecting claim of "procedural fencing" and noting that federal courts should not "be eager to deny plaintiffs their statutorily granted right to forum selection"). Moreover, since Plaintiff was denied an ability to intervene in the SCOOP Litigation, Plaintiff currently has no procedural posture in related Oklahoma proceedings as to that claim against which to race for any preclusive effect. See Masella Decl. Ex. 3.

Under the fourth factor, while there could be future interplay between this Court's interpretation of the Guaranty's provisions and the SCOOP Litigation court's decision as to the distribution of the SCOOP Res, the consequence of the two decisions ultimately impacts whatever relief could be afforded to Plaintiff as a result of the alleged contracted-for equity

transfer from the Estate to others. Interplay, however, does not amount to "friction" between this Court and Oklahoma state court.[8] Dow Jones, 346 F.3d at 359. Furthermore, while New York law, not federal law, is what would control the issues presented, none are "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case . . . at bar," so that any encroachment into the domain of state courts—especially Oklahoma state court—would be minimal to non-existent. Tilley v. Anixter Inc., 283 F. Supp. 2d 729, 738 (D. Conn. 2003) (quoting Minot v. Eckardt-Minot, 13 F.3d 590, 593 (2d Cir. 1994)).

Finally, under the fifth factor, whether there is a better or more effective remedy, Defendants contend that the SCOOP Litigation will adequately settle Plaintiff's claims as to the

---

[8]     In the same fashion, the Special Administrator's citation to Am. All. Ins. Co. v. Eagle Ins. Co., 961 F. Supp. 652 (S.D.N.Y. 1997), is unavailing. There, this Court abstained from hearing a declaratory judgment claim that was duplicative of a matter then concurrently in state court, finding that identical claims brought between the two courts "all involve to a greater or lesser degree the same issue" which created the risk of "piecemeal litigation." Id. at 657. Here, the instant matter and the SCOOP Litigation do not risk creating "inconsistent and asymmetrical results." Id. at 658. Whether plaintiffs in the SCOOP Litigation are entitled to a distribution of equity in the SCOOP Res under the contested contract is a different and distinct question from whether such a distribution is or is not a violation of the Negative Covenants of the Guaranty.

32

Negative Covenants. However, as already noted, Wilmington's request for intervention was denied. Plaintiff's absence from the SCOOP Litigation supports its claim that there is not a better fora for its dispute and counsels against declining jurisdiction. See Fed. Ins. Co. v. Garner, No. 15 Civ. 184 (DAB), 2016 WL 3554929, at *6 (S.D.N.Y. June 20, 2016) (declining Brillhart/Wilton abstention and noting that "the Plaintiff's absence in the Underlying Actions weighs in favor of denying" the motion). While it is possible that Plaintiff could have brought its claim in Oklahoma state court, that is not better, but merely an alternative. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57.

### b. The Motions to Dismiss Based Upon the Probate Exception is Denied

Defendants have also moved to dismiss Plaintiff's Complaint because of lack of subject matter jurisdiction under the judicially-created doctrine of the probate exception, arguing either that Plaintiff's claims seek to interfere with the Oklahoma probate process or attempt to exercise control over property in the custody of the Oklahoma probate court. However, as the instant litigation's claims not fit within such an exception, these arguments are rejected.

33

"The probate exception is one of the most mysterious and esoteric branches of the law of federal jurisdiction." Ashton v. Josephine Bay Paul & C. Michael Paul Found., Inc., 918 F.2d 1065, 1071 (2d Cir. 1990). As the Supreme Court has observed, the probate exception is a "judicially created doctrine[ ] stemming in large measure from misty understandings of English legal history." Marshall v. Marshall, 547 U.S. 293, 293 (2006). The heart of the probate exception is that "a federal court has no jurisdiction to probate a will or administer an estate . . . ." Markham v. Allen, 326 U.S. 490, 494 (1946); see also Lefkowitz v. Bank of N.Y., 528 F.3d 102, 106 (2d Cir. 2007) (holding that, under Supreme Court precedent, "so long as a plaintiff is not seeking to have the federal court administer a probate matter or exercise control over a res in the custody of a state court, if jurisdiction otherwise lies, then the federal court may, indeed must, exercise it"). In practice, this means that even with the probate exception, federal courts still possess "jurisdiction to entertain suits 'in favor of creditors, legatees and [heirs]' and other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." Markham, 326 U.S. at 494

(quoting Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 43 (1909)); see also Moser v. Pollin, 294 F.3d 335, 340 (2d Cir. 2002). Put another way, "it turns out that the [probate] exception is quite narrow." Days Inn Worldwide, Inc. v. Hazard Mgmt. Grp., Inc., No. 10 Civ. 7545 (CM) (KNF), 2012 WL 5519356, at *2 (S.D.N.Y. Nov. 13, 2012).

The Personal Representative argues that the probate exception should apply to the First Cause because it seeks a determination that would dictate how the Estate's assets are to be distributed, an act the Personal Representative avers is a purely probate manner. This argument can be rejected head-on, because that is not the relief that Plaintiff seeks here; rather, Plaintiff is asking this Court to enter judgment after determining whether the amount in contracted-for obligations Plaintiff is owned by the Estate under the terms of the Guaranty, including whether that does or does not include an offset for the value of the Equity Collateral. See Compl. ¶ 85. "A federal court properly 'exercise[s] its jurisdiction to adjudicate rights in [property in the custody of a state court] where the final judgment does not undertake to interfere with the state court's possession save to the extent that the state court is bound by the judgment to recognize the right adjudicated by the federal court.'" Lefkowitz, 528 F.3d at 108

(quoting Marshall, 547 U.S. at 310); see also Ashton, 918 F.2d at 1065 ("Merely determining the rights to, as opposed to administering, assets is not proscribed by the probate exception."); In re Enron Corp., 351 B.R. 305, 310 (Bankr. S.D.N.Y. 2006) (rejecting probate exception dismissal because "[t]he Complaint does not request the immediate transfer of any property belonging to the Baxter Estate"). To be sure, there is a connection between these courts' matters: once Wilmington's rights in the Estate have been determined, it is the probate court's authority to evaluate how to balance those rights with, likely, other creditor claims and, ultimately, distribute the property under its control. Simply because the proceedings are "intertwined" between what would be decided here and what will later need to be decided there does not turn this action into a disgorgement of funds or deprive this Court of jurisdiction over the issue. Lefkowitz, 528 F.3d at 106.

In discussing the probate exception in their respective briefings, both Defendants cite to U.S. Specialty Ins. Co. v. A-Val Architectural Metal Corp., No. 15 Civ. 760 (KBF), 2015 WL 3948115 (S.D.N.Y. June 29, 2015). Curiously, this decision reinforces the notion that what Plaintiff here seeks is not a "purely probate matter" over which the probate exception applies. Id., 2015 WL 3948115, at *2 (emphasis in original). In

36

U.S. Specialty Ins., while finding it could not grant injunctive relief requiring the probate court to perform particular actions as to funds, the court did find it had jurisdiction over a money judgment claim brought against an estate after probate proceedings had been initiated. See id., 2015 WL 3948115, at *5-*6. In doing so, the court reasoned that "adjudicating these claims only requires the Court to determine whether [the plaintiff] has a valid claim against the [estate]—the Court would not (and could not) determine any issues of claim priority, and would not interfere with the state court's possession of the [estate's] funds and property 'save to the extent that the state court is bound by the judgment to recognize the right adjudicated' by this Court." Id., 2015 WL 3948115, at *6 (quoting Lefkowitz, 528 F.3d at 108). The comparable facts presented here warrant a comparable outcome.

In the alternative, Wilmington notes that "the probate exception is only available in the Second Circuit when 'under state law the dispute would be cognizable only by a probate court.'" Days Inn Worldwide, Inc., 2012 WL 5519356, at *2 (emphasis added) (quoting Lamberg v. Callahan, 455 F.2d 1213, 1216 (2d Cir. 1972)); see also United States v. Blake, 942 F. Supp. 2d 285, 296 (E.D.N.Y. 2013). As under Oklahoma statute challenges to a rejected claim may be brought as "as an

independent action," Wilmington argues, the ability to separately bring independent actions renders this kind of proceeding outside the parameters of the exception. See OKLA. STAT. tit. 58, § 339. In response, the Personal Representative avers that the Wilmington Claim Appeal needs to be viewed as an extension of the probate proceeding and, therefore, the probate court because, although it is a separate action, different district courts are all constitutionally part of the "probate proceeding . . . procedural track." Jernigan v. Jernigan, 138 P.3d 539, 545 (Okla. 2006) (describing the "broad, constitutionally-conferred jurisdictional sweep" of state district courts as "indivisible, even though the court's day-to-day exercise of authority stands carved into several separate divisional compartments).

At present, Wilmington's argument is the better. The Oklahoma Supreme Court has stated that during Oklahoma probate proceedings there are "interdocket remedial boundaries." Wilson v. Kane, 852 P.2d 717, 721 (Okla. 1993) (emphasis omitted). Such boundaries are delineated by Oklahoma statute and pertain to both "mainstream" and "ancillary" proceedings. Id. at 722 & n.18. Appeals of denied claims are an ancillary proceeding and, as the Wilson court noted, under Section 339, "[w]hen a [creditor's] claim is rejected [in probate] the holder may bring

suit as an ancillary proceeding in the probate case or as an

independent action . . . ." Id. at 722 n.18 (alterations and

emphasis in original) (quoting OKLA. STAT. tit. 58, § 339). The

Wilson court's emphasis is telling. An appeal of a denied claim

like Wilmington's could have been brought in an ancillary

proceeding, at which point an Oklahoma district court judge,

could hear the case while sitting in probate. See, e.g., In re

Estate of Lovekamp, 24 P.3d 894, 895 (2001 Okla. Civ. App.).

However, under the statutory provision, it is equally

permissible to bring such an appeal as an "independent action,"

which the statute clearly writes as separate from, and therefore

distinct of, "the probate case." See OKLA. STAT. tit. 58, § 339.

Section 339 does not define where such an "independent action"

is to be brought, though recent Oklahoma court decisions have

stated that Section 339 appeals must be in a "proper court." See

In re Estate of Carlson, 367 P.3d 486, 497 (Okla. 2016).[9]


The Personal Representative contends that under State ex

rel. Otjen v. Mayhue, a "proper court" pursuant to Section 339

must be in the "county of probate." 476 P.2d 317, 319 (Okla.

---

[9] By extension, the argument that this action interferes with
the Wilmington Claim Appeal is an interference with a probate
proceeding fails. No evidence has been presented that the
Wilmington Claim Appeal was initiated as an ancillary proceeding
as part of the underlying probate matter rather than as an
independent claim in a different, yet also proper, court.

1970). Two points suggest that Otjen should not be read so narrowly at present.

First, Otjen was decided prior to the 1976 amendments of Section 339, which had previously stated that a holder of a rejected claim "must bring suit in the proper court," and instead added the "ancillary proceeding" and "independent action" language of today. See OKLA. STAT. tit. 58, § 339 Historical and Statutory Notes (detailing pre-1976 statute section language). The revised statutory language, which as described above breaks out the "ancillary" proceeding in the probate case or the separate "independent action," is more expansive than the statutory language that the Otjen court had before it.

Second, the Otjen court was not considering an appeal for a rejected claim when a forum selection clause was present, which here provides the requisite venue that the Otjen court spent its opinion in search of and, ultimately, found lacking as to that plaintiff's money demand claim. See Otjen, 476 P.2d at 318-19 (stating that the issue was whether the probate code statute "provides venue of plaintiff's action against the executor in the county where the estate is being administered" and observing that, under the older Section 339 language, an "[a]ction upon a

rejected claim to establish money demand against the estate must be brought in the county of probate"). To the extent the "proper court" language of earlier Section 339 iterations is still employed, no authority has been presented that indicates that language means anything more than that appeals of denied claims must be in courts where both jurisdiction and venue are established. As described above, this Court has jurisdiction over Plaintiff's claims, and venue is proper under the Forum Selection Clause; this could be a proper court.

Accordingly, the probate exception is inapplicable to the First Cause.

Next, the Special Administrator argues that the Second Cause should be dismissed under the probate exception because Wilmington is asking this Court to exercise control over the Scoop Res and dictate terms of Estate property custody to the probate court. For reasons similar to those already stated above, this argument fails. The Second Cause seeks a declaratory judgment as to whether or not the transfer by the Estate of equity interests in things like the SCOOP Res would be prohibited under the terms of the Guaranty's Negative Covenants. If this Court were to find the Negative Covenant binding on the Estate, that decision would neither dictate to any Oklahoma

court what to do nor prohibit the Estate from following whatever decision is the outcome of the SCOOP Litigation. Such a decision from this Court would not tell the Oklahoma probate court how to administer the property under its control. Rather, at most, it would signal that actions required to be taken under the terms of the contested contract in the SCOOP Litigation constitute a breach of rights under the Guaranty, potentially entitling Wilmington to separate relief. Like discussed above, while each of these pending matters are related, the probate exception does not prohibit such coexistence. See Ashton, 918 F.2d at 1065 ("Merely determining the rights to, as opposed to administering, assets is not proscribed by the probate exception.").

With regard to the Third and Fourth Causes, the Personal Representative contends that the probate exception requires dismissal because to grant declaratory and injunctive relief as to the Financial Information Covenants would require dictating control over information that is properly res property of the Estate. The crux of the issue is whether financial information is an asset that is part of the Estate's res and, therefore, under control of the probate court.

None of the authorities cited by the parties directly address the question of whether financial information regarding

42

assets in an Estate is itself part of the Estate's res.[10] The
Court has also been unable to locate authority on-point.
However, the purpose of the probate exception suggests that pure
financial information cannot be construed as part of the
Estate's res.

As described above, the probate exception "reserves to
state probate courts the probate or annulment of a will and the
administration of a decedent's estate; it also precludes federal
courts from endeavoring to dispose of property that is in the
custody of a state probate court." Marshall, 547 U.S. at 311-12.
In doing so, it prevents federal courts from taking any action
that would "disturb[ ] or affect[ ] the possession of property
in the custody of a state court." Groman v. Cola, No. 07 Civ.

---

[10]    Plaintiff cites Schembechler v. Schembechler, No. 09 Civ.
803 (HJW), 2011 WL 1043457 (S.D. Ohio Mar. 17, 2011), which held
that required turning over information about a trust did not
implicate the probate exception because the exception was not to
be broadened from just estates also to cover trusts. See id.,
2011 WL 1043457, at *4. This matter deals squarely with an
estate, not a trust. The Personal Representative cites U.S.
Specialty Ins., denied injunctive relief to require a probate
court to pay sums to money to particular parties, which offers
no insight as to whether information counts as res property. See
id., 2015 WL 3948115, at *5. To the extent that Munroe v. McGee,
478 F. Supp. 2d 110, 118 (D. Mass. 2007), serves as persuasive
authority, it simply discusses policy and pragmatic
considerations when determining the outer boundaries of the
probate exception, and offers no analysis on how to interpret
financial information about an Estate.

2635 (RPP), 2007 WL 3340922, at *6 (S.D.N.Y. Nov. 7, 2007) (alterations in original) (quoting Marshall, 547 U.S. at 311).

To seek and acquire information about a property does not "dispose," "disturb," or "affect" that property. Limitless numbers of individuals could, theoretically, possess the same financial information that Plaintiff seeks about the Estate. As an illustrative example, were the property in question a car, requiring disclosure of the color of the car, or a copy of the appraised value of the car, or a picture taken of car, would not impact to whom the car was ultimately "dispose[d]." Id. at 312. Providing that information would not "disturb" the eventual adjudication by the probate court of who should get that car. Similar reasoning applies to the financial information sought by Plaintiff. Deciding the question of who should be the property's ultimate possessor is the kind of question for which state probate courts possess "special proficiency." Id. (quoting Ankenbrandt v. Richards, 504 U.S. 689, 704 (1992)). The question presented by Plaintiff's Third and Fourth Causes, a contract dispute, is not.

Accordingly, the probate exception does not apply to Plaintiff's Third or Fourth Causes. See Lefkowitz, 528 F.3d at 106.

44

\* \* \* \* \*

As Chief Justice Marshall once cautioned, "is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should . . . We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given." Marshall, 547 U.S. at 298-99 (quoting Cohens v. Virginia, 19 U.S. (6 Wheat.) 264, 404 (1821)). While ever mindful of the delicate and necessary balance between state and federal courts that the doctrines of abstention discussed above seek to ensure, this Court cannot—and will not—decline jurisdiction over matters properly before it. Plaintiff's case is such a matter.

## c. The Claims Against the Special Administrator are Partially Dismissed

The Special Administrator makes two additional arguments specific to her. First, she avers that the Guaranty does not confer personal jurisdiction over her. Second, she argues that the First, Third, and Fourth Causes should be dismissed for failure to state a claim upon which relief can be granted

45

against her. The former argument fails; the latter argument succeeds.

This Court has personal jurisdiction over the Special Administrator. "Parties can consent to personal jurisdiction through forum-selection clauses in contractual agreements." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 103 (2d Cir. 2006) (citing Nat'l Equip. Rental, Ltd. v. Szukhent, 375 U.S. 311, 315-16 (1964)). The Guaranty's Forum Selection Clause bound McClendon, his "successors and assigns" and his "estate and legal representatives in the event of . . . death." Compl. Ex. C, § 8; see also id., § 14. The Special Administrator has been assigned to represent the Estate in the SCOOP Litigation and, for the duration of that litigation, *inter alia*, to "[e]xercise the Estate's power and authority over [SCOOP Holdings]." Masella Decl. Ex. 2 at 2. The fact that the powers of the Special Administrator as to the Estate are narrower than the Personal Representative, or that she has been appointed for a time-limited purpose, does not mean that personal jurisdiction has not been established.

However, other than the Second Cause, Plaintiff's remaining claims do not state a claim against the Special Administrator and cannot survive her motion to dismiss.

It is well-established that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'". Iqbal, 556 U.S. at 698 (quoting Twombly, 550 U.S. at 570). Plaintiff's First, Third, and Fourth Causes only make allegations against the Personal Representative, the administrator of the Estate. As described above, the powers of the Special Administrator are few and limited to the SCOOP Litigation, powers which are only plausibly implicated by Plaintiff's Second Cause. The remaining claims, which address amounts owed to Wilmington under the Guaranty or relief to acquire financial information sought from the Personal Representative, contain no "fair notice" of what relief the Special Administrator plausibly can afford.[11] Iqbal, 556 U.S. at 698 (quoting Twombly, 550 U.S. at 555). Wilmington argues that,

---

[11]    Plaintiff suggests in its opposition papers that the Special Administrator is a proper party to the remaining causes of action because, hypothetically, "[f]or example, Wilmington . . . may seek financial information from the Estate relative to the SCOOP Litigation." Pl.'s Opp. at 38 n.34. Nowhere in the Complaint is such request described as sought. Even were it to raise above the speculative, which, as discussed above, it does not, its invocation in opposition briefing is too late to "cure a defect in the complaint." Moore v. City of N.Y., No. 15 Civ. 600 (GBD) (JLC), 2017 WL 35450, at *19 n.10 (S.D.N.Y. Jan. 3, 2017) (citation omitted), report and recommendation adopted, No. 15 Civ. 6600 (GBD) (JLC), 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017).

47

had it not brought claims against the Special Administrator, it could potentially be denied complete relief. But Wilmington provides no persuasive and plausible reason why the Special Administrator, with her narrow and time-limited powers, is needed to effect the relief it here seeks. As Wilmington's arguments as to the necessity of the Special Administrator does not establish "a right to relief" from her "above the speculative level," the First, Third, and Fourth Causes as against the Special Administrator are dismissed. Twombly, 550 U.S. at 555.

### d. All Claims Against the Estate are Dismissed

Finally, the Personal Representative contends that the Estate should be dismissed as a party because estates are not juridical persons capable of being sued. Although not perfectly clear, the civil procedure rules and relevant law appear to favor the Personal Representative.

Federal Rule of Civil Procedure 17(b) provides, in relevant part, that the:

Capacity to sue or be sued is determined . . . (1) for an individual who is not acting in a representative capacity, by the law of the individual's domicile; (2) for a corporation, by the law under which it was

48

organized; and (3) for all other parties, by the law
of the state where the court is located . . . .

Fed. R. Civ. P. 17(b).[12] Accordingly, the Estate's capacity to be
sued must be determined by New York law.

New York courts have stated that, under New York law, "[a]n
estate is not a legal entity and any action for or against the
estate must be by or against the executor or administrator in
his or her representative capacity." Visutton Assocs. v. Fastman,
44 Misc. 3d 56, 58, 991 N.Y.S.2d 240, 242 (2d Dep't 2014)
(quoting Grosso v. Estate of Gershenson, 33 A.D.3d 587, 822
N.Y.S.2d 150, 150 (2d Dep't 2006)); see also In re Estate of
Harris, 21 Misc. 3d 239, 241-42, 862 N.Y.S.2d 898, 900 (Sur.
2008) (internal citations omitted) ("Estates, unlike
corporations or other recognized legal entities, may not
litigate in their own name but, instead, can only appear in
litigation by a personal representative. Consequently, when
attorneys state they are appearing on behalf of an estate, such
a statement is technically incorrect because the attorney is

---

[12]  In its briefing, the Personal Representative relies upon
many authorities that are inapposite, since they address the
propriety of replacing a deceased party with an estate under
Federal Rule of Procedure 25. "Rule 25 is not to be confused
with [R]ule 17(b) . . . The former treats of 'Substitution',
while the latter treats of 'Capacity to Sue', and the rules are
separate and distinct." Messner v. Wyte, 33 F.R.D. 288, 289
(S.D.N.Y. 1963) (citation omitted).

representing the personal representative of the estate, and not the estate itself or the beneficiaries of the estate."). Insofar as Wilmington has presented authority in both the Second Circuit and New York State where estates named as defendants, while curiosities, they do not supplant the clear language of the Federal Rules and New York courts.[13] Accordingly, all claims against the Estate are dismissed.

---

[13] See, e.g., Schlaifer Nance & Co. v. Estate of Warhol, 119 F.3d 91, 93 (2d Cir. 1997); Brunner v. Estate of Lax, 47 Misc. 3d 1206(A), 15 N.Y.S.3d 710 (N.Y. Sup. Ct. 2015), aff'd, 137 A.D.3d 553, 27 N.Y.S.3d 148 (N.Y. App. Div. 2016). While admittedly not clear, it is possible these cases kept the "technically incorrect" estates named as defendants because, since executors of the estates were also named but not alleged personally liable, there was no evident harm. In re Estate of Harris, 21 Misc. 3d at 242; see Brunner, 47 Misc. 3d 1206(A), at *3 & n.4.

## Conclusion

Based upon the conclusions set forth above, Defendants'
motions to dismiss are granted in part and denied in part.

It is so ordered.

**New York, NY**
**February** *16* **, 2018**

ROBERT W. SWEET
U.S.D.J.